09 CV 10582

JUDGE CROTTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
G.B., a minor child, by and through his guardian T.B.,
L.B., a minor child, by and through his parent  V.R.,
J.A.., a minor child, by and through his parent M.F.,
S.S., a minor child, by and through his parent V.S.,
A.D., a minor child, by and through his parent J.D.,
S.R., a minor child, by and through her parent E.R.,
S.M., a minor child, by and through her parent E.B.,
A.S., a minor child, by and through his parent C.S.,
C.L., a minor child, by and through his parent K.M.,
and all others similarly situated,



09 CIV _____

       Plaintiffs,

vs.

GLADYS CARRIÓN, in her official capacity as Commissioner
of the New York State Office of Children and Family Services;
JOHN DOEs #1 - 47, in their individual capacities,

       Defendants.
-----------------------------------------------------------------------x

CLASS ACTION
COMPLAINT

JURY TRIAL
DEMANDED

## NATURE OF ACTION

1.     This is a civil rights class action brought by Plaintiffs on behalf of all children who are

now or will be civilly confined in the "limited secure" residential centers, "reception"

residential centers, and the "nonsecure" Lansing Residential Center operated by the New

York State Office of Children and Family Services ("OCFS"), who have been placed for

rehabilitative purposes in OCFS custody by New York State Family Court judges as a

result of  juvenile delinquency proceedings, and who are subject to a pattern and practice

of unconstitutional and excessive force by employees of OCFS and deprived of  legally-

1

required mental health services while in OCFS care and custody.

2.    Despite Defendant Carrión's knowledge of the long-standing and well-documented

nature of these deprivations, a scathing August 2009 findings letter from the United

States Department of Justice ("DOJ"), and the recent report of New York State Governor

David Paterson's expert task force confirming that these are system-wide problems,

OCFS personnel continue to violently and unlawfully restrain members of the Plaintiff

class, and the OCFS facilities at issue fail to provide legally-required mental health

services.

3.    The persistent and unlawful use of force by adult "child care" staff against children who

are in OCFS custody for rehabilitation is shocking and is enabled by the policies and

practices of OCFS.  The  failure to provide even minimally appropriate mental health

screening and treatment, despite the histories of trauma, abuse, and mental health needs

of the majority of children in OCFS facilities, is unconscionable and contributes to the

unnecessary and persistent infliction of improper physical force.

4.    The DOJ findings letter, issued after DOJ's extensive investigation in 2008 of four

representative OCFS facilities, found among other things that "[s]taff at the four

facilities consistently used a high degree of force to gain control in nearly every type of

situation," "restraints are used frequently and result in a high number of injuries," and

"[t]he number and severity of injuries resulting from restraints is made worse by poorly

executed or intentionally harmful restraints."

5.    The DOJ also concluded that mental health care at the facilities "substantially departs

from generally accepted professional standards."

6.    Defendant Carrión received the DOJ's findings letter in August 2009 and has knowledge

of its contents.

7.   While the DOJ's Civil Rights of Institutionalized Persons Act investigation focused on
     the treatment of children in only four OCFS facilities, and the DOJ is requiring
     improvements at those four facilities, the Governor's Task Force report, issued December
     14, 2009, concluded that the deficiencies identified by the DOJ are system-wide in OCFS
     residential facilities.

8.   Defendant Carrión received the Governor's Task Force report on or about December 14,
     2009 and has knowledge of its contents.

9.   While the Governor's Task Force reviewed the entire OCFS residential system, the Task
     Force has no authority to remedy the problems it identified.

10.  Plaintiffs, current residents of OCFS' juvenile facilities, bring this action for injunctive
     and declaratory relief against the defendant Commissioner, and for money damages for
     named plaintiffs against the individual OCFS staff defendants, to redress the violation of
     plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.
     Plaintiffs also bring this action for declaratory and injunctive relief against the Defendant
     Commissioner Carrión, to redress the violation of their rights under the Americans with
     Disabilities Act and the Rehabilitation Act.

11.  Plaintiffs and other residents of these OCFS facilities have been subjected to brutal and
     unlawful use of force in the form of "physical restraints" at the hands of Defendants, and
     have not been kept safe by the Defendants. They have also been deprived of the mental
     health evaluations and treatment to which they are entitled while in OCFS custody.

12.  Plaintiffs bring this action to redress violations of their civil and constitutional rights
     perpetrated by Defendants, acting under color of law. The excessive and improper use of

3

force against children, the failure of Defendant Carrión to ensure that children in her custody receive appropriate mental health treatment, and the policies and practices of Defendant Carrión, endanger Plaintiffs' physical health and safety, threaten their emotional and psychological well being, deprive Plaintiffs of adequate care, and deprive Plaintiffs of due process of law.

13.     Plaintiffs allege that Defendant Carrión acts with deliberate indifference to the serious medical needs of children in her custody with mental illness by failing to provide adequate mental health services, including necessary inpatient and residential mental health programs, by failing to ensure that there are appropriately qualified mental health professionals on staff, and by failing to prevent the use of physical restraints that aggravate and ignore the mental illness of youth in their care and custody of which they are aware. Defendant's conduct discriminates against children with mental illness on the basis of their disability.

14.     Defendant Carrión does not provide necessary treatment opportunities and access to programs for children in OCFS facilities with mental illness. The failure to provide adequate treatment and programs causes mentally disabled children to deteriorate psychologically and emotionally, and to engage in behavior symptomatic of their illnesses. Defendant's deliberate indifference to the serious mental health needs of these children, despite knowledge of those needs, has resulted in a disproportionately high number of OCFS facility residents with serious mental illness – as compared to children without those mental health issues - being restrained and subjected to excessive use of force by OCFS staff. The failure to provide minimally adequate mental health care to Plaintiffs leads to the unnecessary and persistent infliction of improper physical force in

4

the form of physical restraints and other force.

15.     In this action, Plaintiffs, individually and on behalf of the Plaintiff class, seek declaratory and injunctive relief against Defendant Carrión in her official capacity on the grounds that Defendant Carrión has deprived Plaintiffs of their rights under the Fourteenth Amendment of the United States Constitution, as enforced by 42 U.S.C. §1983, 29 U.S.C. §794 (the Rehabilitation Act), and 42 U.S.C. §12132 (the Americans with Disabilities Act).  The individual Plaintiffs also seek redress in the form of money damages against the John Doe Defendants, in their individual capacities, because the John Doe Defendants have deprived Plaintiffs of their rights under the Fourteenth Amendment of the United States Constitution, as enforced by 42 U.S.C. §1983 by their brutal and unlawful use of force against the Plaintiff children in the form of physical restraints.

## JURISDICTION

16.     This action is brought pursuant to the Fourteenth Amendment of the United States Constitution, and to 42 U.S.C. § 1983, and pursuant to 29 U.S.C. §794 (the Rehabilitation Act), and 42 U.S.C. §12132 (the Americans with Disabilities Act).  This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

17.     This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## VENUE

18.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b).  Plaintiffs include children residing in OCFS facility custody in that district, and a substantial part of the events or omissions giving rise to the

5

claims occurred in that district.

PARTIES

19.  Plaintiffs G.B., L.B., J.A., S.S., A.D., S.R., S.M., A.S., and C.L. currently reside in one of
     OCFS' reception, limited secure, or Lansing facilities for youth. Each named Plaintiff
     has been or is subjected to Defendant's unlawful conditions, policies and practices in the
     OCFS facilities, and each has suffered and continues to suffer actual injury as a result.

20.  Each named Plaintiff is a minor, and sues through his or her parent or legal guardian.

21.  Plaintiff G.B. is a 16-year-old boy who was placed in OCFS custody by a New York
     State Family Court judge in July 2009. He currently resides in the OCFS Highland
     Residential Center, located in Highland, New York. He sues by his legal custodian, T.B..

22.  Plaintiff L.B. is a 13-year-old boy who was placed in OCFS custody by a New York State
     Family Court judge in November 2009. He currently resides in the OCFS Highland
     Residential Center, located in Highland, New York. He sues by his parent, V.R..

23.  Plaintiff J.A. is a 16-year-old boy who was placed in OCFS custody by a New York State
     Family Court judge in December 2009. He currently resides in the OCFS Pyramid
     Reception Center, located in the Bronx, New York. He sues by his parent, M.F..

24.  Plaintiff S.S. is a 16-year-old boy who was placed in OCFS custody by a New York State
     Family Court judge in May 2009. He currently resides in the OCFS Highland Residential
     Center, located in Highland, New York. He sues by his parent, V.S..

25.  Plaintiff A.D. is a 15-year-old boy who was placed in OCFS custody by a New York
     State Family Court judge in November 2007. He currently resides in the OCFS Finger
     Lakes Residential Center, located in Lansing, New York. He sues by his parent, J.D..

26.  Plaintiff S.R. is a 16-year-old girl who was placed in OCFS custody by a New York State

Family Court judge in August 2009. She currently resides in the OCFS Tryon Girls limited secure Residential Center, located in Johnstown, New York. She sues by her parent, E.R..

27.   Plaintiff S.M. is a 15-year-old girl who was placed in OCFS custody by a New York State Family Court judge in February 2009. She currently resides in the OCFS Tryon Girls limited secure Residential Center, located in Johnstown, New York. She sues by her parent, E.B..

28.   Plaintiff A.S. is a 15-year-old boy who was placed in OCFS custody by a New York State Family Court judge in August 2009. He currently resides in the OCFS Highland Residential Center, located in Highland, New York. He sues by his parent, C.S..

29.   Plaintiff C.L. is a 13-year-old boy who was placed in OCFS custody by a New York State Family Court judge in November 2008. He currently resides in the OCFS Highland Residential Center, located in Highland, New York. He sues by his parent, K.M..

30.   Defendant Carrión is the Commissioner of the New York State Office of Children and Family Services and is sued in her official capacity. Pursuant to N.Y. Exec. Law Article 19-G, Defendant Carrión has overall executive responsibility for the operation and administration of all juvenile residential facilities, staff, policies and programs under the administration of OCFS, including the facilities at issue in this action, and has responsibility for OCFS' compliance with and enforcement of applicable laws and regulations. Defendant Carrión's responsibilities include "establish[ing], operat[ing] and maintain[ing] treatment programs and other services for youth placed with or committed to the division," and "promulgat[ing] regulations concerning standards for the protection of children in residential facilities and programs operated or certified by the division,

from abuse and maltreatment." N.Y. Exec. Law § 501.

31.     Defendant Carrión's agency, OCFS, is responsible for operating and maintaining
        facilities "for the care, custody, treatment, housing, education, rehabilitation and
        guidance of youth placed with or committed to [OCFS]." N.Y. Exec. Law § 504.

32.     As Commissioner, Defendant Carrión is responsible for the care, custody, and control of
        all children housed in OCFS' Division of Juvenile Justice and Opportunities for Youth
        ("DJJOY") residential facilities.

33.     John Does #1 - 47 were at all times referred to in this complaint youth division aides,
        youth counselors, or other OCFS staff responsible for the care and custody of children,
        employed by OCFS and assigned to OCFS-operated DJJOY residential facilities. These
        defendants are sued in their individual capacities. At all times referred to in this
        Complaint, all John Doe defendants were acting within the scope of their employment as
        employees of OCFS, and acting under color of state law. Plaintiffs do not know the
        names of the OCFS personnel sued as John Does and will amend this Complaint to state
        the true names when they become known.

                            CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action on behalf of all present and future residents, sentenced by New
        York State Family Court judges after a finding of juvenile delinquency, confined in any
        of the facilities operated directly by OCFS that OCFS classifies as "reception" or "limited
        secure," and the Lansing Residential Center.

35.     These facilities currently are the Pyramid Reception Center in Bronx, New York and the
        Tryon Girls' Reception Center in Johnstown, New York, which OCFS classifies as
        "limited secure;" the Lansing Residential Center in Lansing, New York, which OCFS

                                      8

classifies as "limited secure;" and the Highland Residential Center in Highland, New York, Tryon Boys' Residential Center in Johnstown, New York, Tryon Girls' Limited Secure Residential Center in Johnstown, New York, Industry Limited Secure Residential Center in Rush, New York, Finger Lakes Residential Center (until December 2009 known as Louis Gossett, Jr. Residential Center) in Lansing, New York, Taberg Residential Center in Taberg, New York, and Sergeant Henry Johnson Youth Leadership Academy in South Kortright, New York., all of which OCFS classifies as "limited secure" centers.

36.    All of the facilities listed above are directly operated by OCFS, through DJJOY.

37.    This action is brought pursuant to the Federal Rules of Civil Procedure, Rules 23(a), (b)(1) and (b)(2).

38.    The class meets the requirements of Rule 23 as follows:

    a.    There are approximately 500 youth confined within the aforementioned facilities at any one time. Defendant Carrión has stated publicly that "more than 80 % of children [residing in OCFS facilities] have mental health needs of clinical significance." Physical restraints are used by staff on children at all of these facilities, pursuant to a system-wide policy and practice. OCFS staff physically restrain children in these facilities on a regular basis. The numerosity of the class makes joinder of all members impracticable; in addition, membership of the class changes continuously, as new children are placed and others are discharged, compounding the impracticability of joinder.

    b.    The questions of law and fact presented by the named plaintiffs are common to other members of the class. Such questions include the existence of a pattern

9

of improper and excessive use of physical force and the existence of an OCFS-wide

failure to evaluate and treat the mental health needs of children in the agency's care.

These practices, policies, and procedures result in both the frequent infliction of severe

physical and psychological injuries on children confined in these facilities, and the

maintenance of an atmosphere of fear and intimidation. As a result, every youth in these

facilities risks being subjected to and injured by these unlawful practices. The claims and

practices alleged in this complaint are common to all members of the class.

      c.     Defendants impose the conditions, treatment, policies and practices

challenged in this action on the named Plaintiffs and on the members of the Plaintiff class

so that the claims of the named Plaintiffs are typical of those of the class. The entire

class will benefit from the relief sought.

      d.     Plaintiffs G.B., L.B., J.A., S.S., A.D., S.R., S.M., A.S., and C.L. are

presently confined within facilities operated by OCFS. These named plaintiffs will fairly

and adequately protect the interests of the class. The Legal Aid Society, counsel for

plaintiffs, is a legal services organization with extensive experience in civil rights

litigation including litigation in federal and state courts on behalf of children and adults in

the juvenile and criminal justice systems, and litigation regarding the mental health needs

of children. Orrick is a law firm with offices in New York City that has extensive

experience in complex federal litigation and class actions.

39.     The class also meets the requirements of Rule 23 because Defendant Carrión has acted,

or failed to act, on grounds generally applicable to the class, thereby making appropriate

injunctive relief with respect to the class as a whole. The policies and practices at issue

regarding the use of physical force and the failure to provide mental health treatment to

10

which children in OCFS custody have a right are policies and practices in every facility complained of in this action, and affect all children in the class.

## FACTUAL ALLEGATIONS

The Facilities and Treatment of the Youth Confined

40.    It is well-documented that children in OCFS custody have a high prevalence of pre-placement exposure to trauma, including childhood histories involving physical, sexual and emotional abuse.  As a result many residents have serious mental health issues when they enter placement.

41.    Dr. Lois Shapiro, Director of OCFS' Bureau of Behavioral Health Services, has stated that "[s]tudies indicate that up to 70 % of the youngsters admitted to New York State's juvenile justice system present with significantly complex mental health needs."

Use of Excessive and Inappropriate Force

42.    OCFS' 2007 restraint policy limits the circumstances under which staff is permitted to use physical restraints, yet these written limitations do not ensure the safety of residents, as they do not prevent the persistent and unlawful use of force against children in OCFS custody.

43.    OCFS' "Use of Physical Restraint" policy defines "physical restraint" as "physically controlling a youth and/or physically holding or escorting a youth from one place to another."  OCFS Use of Restraint Policy and Procedures Manual PPM 3247.13.

44.    This written policy allows staff to use physical restraints "only under the following circumstances when all other appropriate pro-active, non-physical behavioral

11

management techniques have been tried and have failed: (1) to prevent a youth from harming him or herself, staff members or others: (2) to prevent an escape or AWOL by a youth; and (3) to escort a youth who is causing or threatening to cause an immediate serious disruption that threatens the safety of others; or (4) the youth's behavior is escalating to the point that further de-escalation techniques need to take place in another location."

45.    The OCFS physical restraint policy has not kept OCFS staff from using physical restraints on children in a persistent and egregious manner.

46.    OCFS staff use a particularly problematic and dangerous type of restraint, known as the prone restraint technique. Prone restraints involve the child being placed face down on the ground while at least two adult staff members hold the child down and put pressure on the child's body. During the prone restraints, OCFS adult staff hold and/or handcuff the child's hands behind his back.

47.    Prone restraints expose children to the risks of difficulty breathing, cardiac and respiratory arrest, back, arm and neck injuries, abrasions, bruises, strained muscles and other musculoskeletal injuries, and head injuries. Children have died or have suffered catastrophic injuries as a result of these restraints. In 2006, a young boy from the Bronx died in OCFS custody after being physically restrained by staff at the Tryon facility. Earlier, a 14-year-old boy "suffer[ed] serious and permanent physical and mental injuries," following successive physical restraints by staff in 1996 at OCFS' Gossett (now called Finger Lakes Residential) facility. See Jackson v. Johnson, 118 F. Supp. 2d 278, 285 (N.D.N.Y. 2000). In both instances, prone restraints were used.

48.    Although Defendant Carrion has adjusted the OCFS restraint policy following these

tragic occurrences, the changes have not ameliorated the problems with the policy, either as written or as applied. As written, it remains vague and allows too much discretion to staff. In practice, OCFS staff members continue to respond to residents' refusal to follow directives or to other, nonviolent speech or behavior with the use of force.

49. Upon information and belief, many OCFS staff routinely ignore the portion of the policy that directs them not to use physical restraint unless non-physical techniques have been tried and have failed.

50. OCFS staff regularly use handcuffs on children in DJJOY facility custody during physical restraints, despite OCFS "Use of Mechanical Restraints" policy which states "It is the policy of OCFS to limit the use of mechanical restraints in its facilities . . . the types that are used, the circumstances under which they are used and the length of time they are used. The use of mechanical restraints as a form of punishment is prohibited. Mechanical restraint shall mean handcuffs and footcuffs." OCFS PPM 3247.14.

51. The risks of OCFS' restraint practices are well known to defendants. Plaintiffs' counsel has alerted OCFS to them in letters and repeated meetings. The Legal Aid Society wrote to then-OCFS Commissioner John Johnson and then-Deputy Commissioner for Rehabilitative Services, Ed Ausborn, on November 29, 2006, expressing serious concerns about the overuse and misuse of physical restraints at the OCFS Lansing facility for girls. Plaintiffs' counsel had learned that in the month of October 2006 alone, there were more than 200 restraints performed by staff against residents at Lansing. The consequences to young girls of the trauma of restraint have been and are devastating, particularly in light of the prior experience of many girls in OCFS facilities who have already been victims of sexual abuse and physical abuse.

13

52.   Plaintiffs' counsel also wrote a detailed letter to the Department of Justice's Civil Rights Division in August 2008 and copied Defendant Carrión, bringing to Defendant Carrión's attention the continuing serious issues involving use of force and lack of mental health treatment and the nexus between the two.

53.   The Defendant Commissioner knows that the pattern of physical abuse described above existed and still exists in many of the OCFS facilities. The prevalence of these practices and general knowledge of their existence, and the failure of the Defendant to take adequate remedial action despite the fact that the misuse of force in OCFS youth facilities has been repeatedly brought to their attention, constitutes deliberate indifference to the rights and safety of the youth in the agency's care and custody, including those residents named as Plaintiffs in this action.

54.   OCFS operates under a system-wide use of physical restraint/ use of force policy. All staff are trained by the same training unit, and the agency maintains a centralized office to issue policies and procedures, oversee training, and investigate complaints.

55.   OCFS' central supervisory staff receive all reports of physical restraint and injuries to children in OCFS DJJOY facilities. These reports are in writing and also, in some cases, include videotape of the restraints.

56.   Upon information and belief, these restraint reports routinely document the infliction of serious injuries on children by OCFS staff.

57.   In December 2007, OCFS documented 108 restraints at Tryon Boys, 14 at Gossett (now Finger Lakes), 41 at Highland, 49 at Industry, 37 at Lansing, 4 at Pyramid, 2 at Taberg, 22 at Tryon Girls and 11 at YLA.

58.   In February 2008, OCFS documented 71 restraints at Tryon Boys, 25 at Gossett (now

Finger Lakes), 58 at Highland, 38 at Industry, 46 at Lansing, 54 at Tryon Girls, and 14 at YLA.

59.   In one week of July 2008 alone, the Lansing facility documented 40 restraints and Gossett documented 24.

60.   The documented use of restraints on children by OCFS staff has been so high that high-level OCFS administrators have called for reductions.  For example, in June 2008, Deputy Commissioner Anthony Hough required a "restraint reduction action plan" for the Gossett facility (now called Finger Lakes), also calling for an "explanation for the high volume of restraints."

61.   Notwithstanding the fact that high-ranking officials in OCFS' central office know or knew that a pattern existed in OCFS-operated youth facilities of young residents being routinely injured by OCFS staff, under circumstances that clearly indicated that staff was utilizing excessive and unnecessary force, Defendant Carrión has failed to implement measures that would curb the unlawful conduct of her subordinates.

62.   Defendant Carrión has admitted: "My greatest disappointment continues to be the number of restraints in my system — that we still have a correctional model where kids get hurt." (*New York Times*, December 15, 2009).  This conclusion is consistent with the findings of the United States Department of Justice after its investigation of four representative OCFS DJJOY facilities.

63.   The use of disciplinary measures against OCFS staff has not deterred the use of excessive forced and improper restraints on children in OCFS custody.

64.   With rare exception, OCFS facility staff whose misconduct is brought to the attention of supervisory personnel continue to work in OCFS-operated facilities where they have

daily contact with children, without any substantial disciplinary action being taken against them.

65.    Defendant Carrión has admitted: "I have people on staff that have two, three, four, five cases of abuse or inappropriate restraint, and I can't get rid of them." (*New York Times*, December 15, 2009.)

Inadequate Mental Health Care

66.    The mental health services available in the OCFS DJJOY facilities at issue in this action fail to identify and meet the mental health needs of this population, which has a right to mental health care while in OCFS custody.

67.    In its mental health training guide for staff, OCFS acknowledges its "ethical and legal obligation to provide [mental health] services" for the children in its care and custody. In that same guide, OCFS concedes that it "do[es] not have all the financial resources, time, staffing, energy, etc" that the agency "need[s] to accomplish all [it] need[s] for the youth in its care."

68.    The mental health screening performed at the OCFS reception centers is inadequate to identify children's needs and provide them with continuity of care and appropriate care and treatment.

69.    In addition to the inadequate procedures at reception centers, screening, diagnosis and treatment of children with mental health needs are inadequate at the limited secure facilities and Lansing.

70.    OCFS records reveal that treatment plans for children in need of mental health services are largely boiler-plate, contain very little patient-specific information, and do not appear to be updated in a substantive manner to reflect changes in behavior, rule violations, use

of restraints, or the consequences of using restraints on the particular youth given his or her history of exposure to trauma or his or her mental health problems.

71.     As a result of inadequate screening and treatment plans, Defendant Carrión fails to provide necessary mental health treatment to young people in OCFS DJJOY custody.

72.     Inadequate mental health screening, diagnoses and treatment causes harm to young people, including decompensation, exposure to the use of force and restraints by staff, improper and inappropriate use of disciplinary procedures in response to behaviors that are manifestations of mental illness, placement in more restrictive settings as a means of behavioral control, lengthy or protracted periods of incarceration, and or multiple placements.

OCFS Substitutes Improper Physical Restraint for Appropriate Mental Health Treatment

73.     The lack of mental health treatment has been addressed by OCFS staff with the use of physical force against children in OCFS facilities. OCFS staff use physical force disproportionately against children with mental illness. Defendant Carrión discriminates against mentally disabled youth in OCFS facilities by failing to provide disciplinary alternatives to physical restraint as a reasonable accommodation so that the restraints, which exacerbate mental illness, are not imposed.

74.     New York State's Office of the Inspector General and the Tompkins County District Attorney's Office investigated the use of force at the OCFS Gossett (now known as Finger Lakes) facility, issuing a report in November 2006. Their analysis "revealed a highly significant correlation between those residents medicated for psychiatric and emotional disorders and the frequency of restraints. . . . As demonstrated by the analysis, residents medicated for psychiatric or emotional disorders were approximately 3.5 times

17

more likely to be restrained than residents not so medicated."

75.    Defendant Carrión has knowledge of this investigation and its findings.

76.    New York State Executive Law requires that Defendant Carrión "establish, operate and

maintain treatment programs and other services for youth placed with or committed to the

division and programs . . . ." N.Y. Exec. Law 501. Defendant Carrión has "all necessary

powers to see that the purposes of each facility or program are carried into effect."

77.    Defendant Carrión is also required to "promulgate regulations concerning standards for

the protection of children in residential facilities and programs operated or certified by

the division, from abuse and maltreatment. Such standards shall include the prevention

and remediation of abuse and maltreatment of children in such residential facilities or

programs . . . ." Defendant Carrión's duties include establishing "minimal experiential

and educational qualifications" for employees, "assuring adequate and appropriate

supervision of employees." N.Y. Exec. Law § 501.

Placement of Children in Defendant Carrión's OCFS Facilities

78.    New York State Family Court Act § 301.2(1) provides that juvenile delinquency

proceedings may be brought against children ages 7 through 15 in New York State

Family Court. If the court enters a finding that the child committed an act which if

committed by an adult would be a crime pursuant to F.C.A. §345.1, and determines after

a dispositional hearing that the child is a juvenile delinquent in need of supervision,

treatment or confinement, one possible outcome is that the court may "place" the child,

pursuant to F.C.A. §§ 352.1 and 352.2, at a facility operated by the Defendant

Commissioner.

79.    Family Court Act § 353.3 provides that children placed with the Defendant

Commissioner may be placed for up to 12 or 18 months, and may be placed in various settings, including "limited secure" and non-secure facilities operated by or under contract with OCFS. At the conclusion of the child's initial placement period, OCFS may petition the Family Court for an extension of the child's placement pursuant to F.C.A. § 355.3.

80. At the conclusion of his residential stay with OCFS, the child may be released into the community, but may be placed on "aftercare." If OCFS wishes to mandate that a child be on aftercare after the end date of his initial sentence, OCFS must obtain an extension of placement order from the Family Court, pursuant to F.C.A. § 355.3.

81. Children on "aftercare" remain under OCFS supervision. If OCFS staff find that young people on aftercare have violated the conditions of the aftercare, the children's aftercare may be "revoked," meaning that the children are placed back into OCFS DJJOY residential care and custody.

Assignment of Youth to OCFS Residential Facilities

82. Once a Family Court judge places a child with OCFS, unless the placement is designated as being for a contracted facility that is not directly operated by OCFS, within approximately two weeks, OCFS admits the child to one of its two reception centers.

83. Girls who enter OCFS DJJOY custody are sent to the Tryon Girls' Reception Center, in Johnstown, New York, and boys who enter OCFS DJJOY custody are sent to the Pyramid Reception Center in Bronx, New York.

84. OCFS houses children at the reception centers for approximately two weeks, during which time OCFS is supposed to assess the children's needs and determine which facility placement is appropriate for each child, within the OCFS DJJOY system. OCFS

19

then transports youth to a DJJOY facility, which may be anywhere in New York State.

The Facilities at Issue

85. As of November 16, 2009, OCFS DJJOY operated seven facilities classified as "limited secure," and two facilities classified as "reception." The Lansing facility for girls has recently been re-classified from a "limited secure" facility to a "nonsecure" facility.

86. As of November 16, 2009, the limited secure OCFS facilities are Highland Residential Center in Highland, New York, Tryon Boys' Residential Center in Johnstown, New York, Tryon Girls' Limited Secure Residential Center in Johnstown, New York, Industry Limited Secure Residential Center in Rush, New York, Finger Lakes Residential Center (until December 2009 known as Louis Gossett, Jr. Residential Center) in Lansing, New York, Taberg Residential Center in Taberg, New York, and Sergeant Henry Johnson Youth Leadership Academy ("YLA") in South Kortright, New York. As of that date, these facilities had a total population of 451 children, with an available capacity of 562 children.

87. As of November 16, 2009, the OCFS reception facilities, Pyramid Reception Center in Bronx, New York, and Tryon Girls' Reception Center in Johnstown, New York, had a total population of 40 children, with an available capacity of 57 children.

88. The nonsecure Lansing Residential Center is located in Lansing, New York. As of November 16, 2009, Lansing had a total population of 25 girls, with an available capacity of 50 girls.

89. In total, the facilities covered by this action, as of November 16, 2009, had a total population of 516 children, with an available capacity of 669 children.

90. Defendant Commissioner Carrión has admitted that "more than 80 % of children

[residing in OCFS facilities] have mental health needs of clinical significance."

Findings of the U.S. Department of Justice, the Governor's Task Force and Others

91.   The illegal use of force against children in OCFS facilities and deprivation of required

mental health services are pervasive and continuing, and well-known to the Defendant

Commissioner, as evidenced by a recent United States Department of Justice ("DOJ")

Civil Rights Division investigation and Findings Letter focusing on four OCFS DJJOY

facilities, the recent Governor's Task Force report focusing on the entire OCFS system,

and a host of other reports and studies.

92.   On August 14, 2009, the United States Department of Justice issued a Findings Letter to

Defendant in conjunction with DOJ's 2008 Civil Rights of Institutionalized Persons Act

investigation of the Lansing, Gossett (now called Finger Lakes), Tryon Boys and Tryon

Girls OCFS facilities.  The DOJ letter calls for remediation of the deficiencies identified.

93.   In its findings letter, DOJ states that"[s]taff  at the four facilities consistently used a high

degree of force to gain control in nearly every type of situation."

94.   The DOJ investigation also revealed that "restraints are used frequently and result in a

high number of injuries," and that "[t]he number and severity of injuries resulting from

restraints is made worse by poorly executed or intentionally harmful restraints."

95.   DOJ additionally found and detailed the ways in which mental health care at the facilities

"substantially departs from generally accepted professional standards."

96.   In connection with the finding of "Use of Excessive Force and Inappropriate Restraints,"

the DOJ findings letter states::

> Staff at the four facilities consistently used a high degree of force
> to gain control in nearly every type of situation.

> A full restraint involves staff ultimately placing the youth face down on the ground with his or her arms behind the back. The youth is frequently handcuffed by staff while in this position.
>
> Anything from sneaking an extra cookie to initiating a fistfight may result in a full prone restraint with handcuffs. This one-size-fits-all control approach has not surprisingly led to an alarming number of serious injuries to youth, including concussions, broken or knocked-out teeth, and spiral fractures.
>
> The number and severity of injuries resulting from restraints is made worse by poorly executed or intentionally harmful restraints.
>
> In particular, the use of prone restraints is controversial and has been banned by many facilities nationwide due to the high risk of serious injury or death. In spite of the known risk of prone restraints, staff at the facilities are trained to use prone restraints. The danger of prone restraints is that if the individual's airway is constricted, he or she is unable to express physical distress. Further, the restrained individual's struggle for air may be misconstrued by staff as resistance, resulting in increased force on the restrained individual. Indeed, in November 2006, a 15-year-old resident at Tryon Boys died following a prone restraint. The youth allegedly pushed a staff member and was then pinned facedown on the floor and handcuffed by two staff. The youth stopped breathing only minutes later, and then died at a nearby hospital. His death was ruled a homicide by the medical examiner. Despite this tragic death, a dangerous combination of high rates of prone restraints and a low standard for initiating a restraint remains at the facilities.

97.   In connection with the finding of a "Failure to Adequately Investigate Use of Force Incidents," the DOJ findings letter states:

> Many of the investigations our expert reviewed were inadequate, both by agency and generally accepted professional standards. For example, some investigations were superficial and failed to include relevant evidence or any attempt to reconcile conflicting evidence. Some investigations were not conducted by detached investigators, which calls their reliability into question.

98.   In connection with the finding of a "Failure to Take Corrective Action Against Staff," the DOJ findings letter states:

> Contrary to generally accepted professional standards,
> administrators in the facilities take no action, impose actions that
> are inconsistent with the seriousness of the violation, or fail to
> impose action in a timely manner.

99.   In connection with the finding of a "Failure to Provide Adequate Mental Health Care and

Treatment," the DOJ findings letter states:

> We find that the mental health care at Lansing, Gossett, Tryon
> Boys, and Tryon Girls substantially departs from generally
> accepted professional standards. Specifically, we find that: 1)
> inadequate behavioral management has led to an over-reliance on
> restraints and other forms of punishment to control youth's
> behaviors; 2) evaluation and diagnoses are inadequate; 3) the
> facility follows poor medication administration; 4) treatment
> planning is inadequate; and 5) substance abuse treatment is
> insufficient.
>
> Our investigation revealed that, while some attempts had been
> made to establish individual behavior management plans for youth
> with mental illness, the facilities failed to address problematic
> behavior and mental health crises with the least restrictive
> measures. Restraints were the standard for controlling behavior at
> all four facilities, and youths with mental illness were restrained
> more often than other youth.
>
> The majority of psychiatric evaluations at the four facilities did not
> come close to meeting [applicable criteria]. The evaluations
> typically lacked basic, necessary information, including
> justification for the diagnosis and evidence of prior record review.
> As a consequence, the treatment of youth with serious mental
> illness was based on poor information and was generally
> ineffective.
>
> Failing to properly evaluate and diagnose mental health problems
> results in ineffective treatment and harm to youth.
>
> Across the four facilities, there was a pervasive lack of
> documentation of either the target symptoms for the medications or
> monitoring of the effectiveness(or lack thereof) of medication on
> those target symptoms.

Our review of the four facilities' psychotropic medication practices showed substantial departures from generally accepted professional standards.

Informed consent procedures at the four facilities substantially depart from generally accepted professional standards. We found that, in practice, staff members calling the parent/guardian to obtain informed consent typically did not have prescriptive authority, and therefore were not able to discuss the medication with the parent/guardian. Consent obtained in this manner is not "informed." Each facility's informed consent process relied on professionals without prescribing authority to contact the parent/guardian for verbal consent.

The treatment plans at all four facilities substantially departed from [applicable] standards. Many youths had complex mental health needs documented in their records, but the treatment plans were superficial, generalized, and in jargon which the youths did not understand.

However, the treatment teams generally lacked critical members, most often the youth and the psychiatrist.

Many youth at the four facilities had well-documented trauma that was left untreated and unaddressed in treatment planning.

Failing to help these youths with past trauma means that they will probably continue to be reactive and aggressive upon their return to the community.

100.  The DOJ findings letter and their requirement of remedial action focuses only on four

OCFS DJJOY facilities:  Finger Lakes, Lansing, Tryon Boys and Tryon Girls.

101.  Several other investigations and reports have revealed and made known to Defendant

Carrión and her predecessor in office the egregious conditions in the OCFS DJJOY

facilities.

102.  On December 14, 2009, a task force of experts convened in September 2008 by New

York's Governor issued publicly and delivered to the Governor a report entitled

"Charting a New Course:  A Blueprint for Transforming Juvenile Justice in New York

24

State." The task force report documents "alarming conditions" in OCFS DJJOY
facilities.

103.   The task force's review found "youth with limited access to meaningful services and
programs," facilities that "are punitive and feel like adult prisons," and staff who "are
sometimes quick to resort to punishment and excessive force in situations that do not
warrant such an approach." "Such conditions are unacceptable," the task force
concluded, "and indicate that the current system is failing to protect the safety of youth
placed in OCFS custody." Addressing the issue of mental health treatment, "[t]he Task
Force found that many state-operated placement facilities lack sufficient resources to
ensure that youth receive an array of necessary services," agreeing with the DOJ finding
that mental health services are "either inadequate or unavailable due to poor assessments
and limited staffing."

104.   Defendant Carrión received a copy of the Task Force report in December 2009 and has
knowledge of its contents.

105.   The portion of the Task Force report focusing on OCFS' residential facilities finds
deficiencies system-wide, but the task force has no authority to remedy the deficiencies.

106.   In December 2009, the Citizens' Committee for Children of New York, Inc. ("CCC"),
issued a report entitled "Inside Out: Youth Experiences Inside New York's Juvenile
Placement System." The report is based on a longitudinal study beginning in 2003 of a
group of young people who were placed in OCFS DJJOY facilities. The study found
inadequate mental heath and youth development services to meet the needs of youth in
care, inadequate services planning, gaps and errors in case files, and that "OCFS staff
relied heavily on a behavior compliance approach that too frequently employed the use of

physical restraints to manage negative youth behavior." CCC concluded that there is "an
enormous disconnect between the pro-social youth development goals that youth are
expected to achieve and the corrections-based behavior management approach used
throughout placement."

107. Defendant Carrión is on notice of the CCC's findings. According to its report, the CCC
shared its preliminary findings with Defendant Carrión and her Deputy Commissioner for
DJJOY in early 2007.

108. A September 2007 report prepared by the New York State Committee on Restraint and
Crisis Intervention Techniques finds that "all forms of physical restraint come with
inherent risk due to the hazardous circumstances in which restraints are applied." Risks
to children during the restraint process include exposure to trauma, physical injury and
death. The report states that "the use of restraints is recognized as an intervention of last
resort." Committee on Restraint and Crisis Intervention Techniques, "Behavior and
Management: Coordinated Standards for Children's Systems of Care," Final Report to
the Governor, September 2007. Upon information and belief, Defendant Carrión has
knowledge of this report and its contents.

109. Disability Advocates, Inc. (DAI), a New York State based protection and advocacy group
for persons with disabilities, reviewed documents it received from OCFS and found that
physical restraints were overused and improperly used in the OCFS facilities. DAI found
that the prone restraint technique used by OCFS is a "highly risky method," as is
allowing weight-bearing by staff on children during restraints. In an April 2007 letter to
Defendant Carrión's Deputy Commissioner Nieves, with a copy to Defendant Carrión,
DAI notified Defendant Carrión of their findings and urged OCFS to implement a

26

restraint policy that would allow "restraints only be used to prevent <u>imminent</u> harm."

110. Referring to OCFS' prone restraint technique, in its letter DAI advised Defendant Carrión that the prone restraint technique is "prohibited by NYS's Office of Mental Health, Office of Mental Retardation and Developmental Disabilities and strictly limited by the Department of Corrections." Defendant Carrión has knowledge of these findings.

111. New York State's Office of the Inspector General and the Tompkins County District Attorney's Office investigated the use of force at the OCFS limited secure Gossett (now known as Finger Lakes) facility and issued a report in November 2006. Their analysis "revealed a highly significant correlation between those residents medicated for psychiatric and emotional disorders and the frequency of restraints." Defendant Carrión has knowledge of this report and its findings.

112. A 2006 Human Rights Watch and American Civil Liberties Union report, based on an investigation of the OCFS Lansing and Tryon Girls facilities, concluded that OCFS' use of force policy was not in compliance with "national and international standards regarding the use of force against children" which permit force to be used only when a child poses an imminent threat of injury to self or others and all other means of control have been exhausted. Upon information and belief, Defendant Carrión has knowledge of this report and its findings.

113. The plaintiffs in this case have traits that make it difficult or nearly impossible to complete the use of the three-step grievance process in the OCFS facilities at issue in this action and, as a result, to assert their rights to safe and adequate treatment. These barriers include the young age, emotional and mental disabilities and/or mental retardation, and low educational level of age of many of the Plaintiffs and Class members.

114. Upon information and belief, some children in the OCFS DJJOY facilities at issue in this action do not report or complete the three-step grievance process because it fails to assure confidentiality.

115. In some instances, children have received threats of retaliation by staff and other residents if they complain about the conditions of their confinement.

116. The current OCFS grievance system fails to provide an effective means for Plaintiffs to report incidents of use of excessive force or unreasonable restraint, without fear of retaliation.

The Named Plaintiffs

G.B.

117. Plaintiff G.B. is a 16-year-old boy who was placed in OCFS custody by a New York State Family Court judge in July 2009. He currently resides at the OCFS limited secure Tryon Boys Residential Center, located in Johnstown, New York.

118. G.B.'s home is in Brooklyn, New York, with his grandmother, T.B., who is his legal custodian, along with his aunt, uncle, and sister.

119. G.B. is approximately 4 feet 7 inches tall and weighs approximately 107 pounds.

120. G.B. has mental health needs and has been diagnosed with moderate mental retardation.

121. When the Family Court placed G.B. in OCFS custody in July 2009, the judge ordered OCFS to provide him a placement with mental health services.

122. OCFS did not place G.B. on a mental health unit until in or about December 2009.

123. Upon G.B.'s entering OCFS custody, OCFS sent G.B. to the Pyramid Reception Center in the Bronx, New York.

124. When G.B. entered OCFS custody, OCFS was aware that G.B. had been psychiatrically hospitalized three times prior to his placement.

125.   The most recent hospitalization occurred in or about May 2008.  During that hospitalization, G.B. was diagnosed with a conduct disorder, impulse control disorder and a mood disorder.  The hospital noted that G.B. is of short stature for his age.  During his hospitalization G.B. was prescribed and began taking Abilify, an anti-psychotic medication.

126.   Upon his admission to OCFS' Pyramid facility, G.B. received a psychological evaluation and was diagnosed with mood disorder, conduct disorder, impulse control disorder, and moderate mental retardation.  The evaluator noted that G.B. had been psychiatrically hospitalized at ages 13, 14, and 15.

127.   Educational evaluations reflect that as of in or about August 2009, G.B. was on a first grade academic level in all areas.

128.   In August 2009, OCFS transferred G.B. to the Highland facility, where he was not placed on a mental health unit.

129.   The OCFS Highland social worker who screened G.B. upon his admission recommended a referral to the Committee on Special Education, clinician monitoring, and a referral to a psychiatrist.

130.   Upon information and belief, G.B. did not see a psychiatrist while at Highland except when he saw a psychiatrist once for medication review.

131.   Despite OCFS' knowledge of G.B.'s mental health history and its own staff's recommendations for mental health services, OCFS did not move G.B. to a mental health unit until in or about December 2009, after a lengthy Family Court hearing at which his attorney advocated strenuously for mental health treatment for G.B. outside of an OCFS facility.

132. On or about December 11, 2009, G.B. was transferred to OCFS's Tryon Facility to reside in its Mental Health Unit.

133. While G.B. was at Highland, he broke his arm. His left arm was swollen but no staff helped him until his grandmother visited and asked that he be taken to the hospital.

134. Between September 2009 and December 2009, OCFS staff at Highland physically restrained G.B. at least five times.

135. The first restraint occurred in the school when G.B. asked to see a nurse because his broken arm was hurting. When the staff refused, G.B. got up and tried to walk out of the classroom but a youth division aide ("YDA") stopped him,

136. Without a warning or other attempt to stop G.B. without physical force, the OCFS YDA, John Doe #1, threw G.B. to the ground and bent his broken left arm behind his back. G.B. later heard the OCFS administrator on duty ("AOD") say that the YDA should not have restrained him because his arm was broken.

137. The second restraint occurred the following day. The same YDA, John Doe #1, was in the class and, when G.B. was walking out of the room, the YDA pulled G.B.'s shirt twice and then hit him in the face. G.B. fell to the floor and the YDA banged G.B.'s head on the floor and again bent G.B.'s broken left arm behind his back.

138. Later, the AOD told G.B. that this YDA would not be around anymore and that he did not need to press charges.

139. The third restraint occurred after another resident called G.B. gay and a YDA laughed. Because he laughed, G.B. threw paper on the floor. The YDA, John Doe #2, told G.B. to pick up the paper, then pushed G.B. and put G.B. in a choke hold. G.B. could not breathe and was kicking to get away when he heard another staff member, John Doe #3, say "take

him down." The YDA threw G.B. to the floor. After the restraint, G.B.'s chest hurt for a week.

140. The fourth restraint at Highland occurred after G.B. got into a fight with another resident. The staff did not warn him or otherwise intervene in a non-physical way. The YDA, John Doe #4, threw G.B. to the floor and bent G.B.'s broken arm behind his back again.

141. The fifth restraint at Highland occurred in the gym. Another resident jumped G.B. and said "staff wanted me to do this." G.B. was kicking the other resident to get the attacker off him when another YDA, John Doe #5, restrained him with a standing restraint.

L.B.

142. Plaintiff L.B. is a 13-year-old boy who was placed in OCFS custody by a New York State Family Court judge in November 2009.

143. L.B.'s home is in Brooklyn, New York, with his father, stepmother, and siblings.

144. OCFS first placed L.B. at the Pyramid Reception Center, where they kept him for two weeks. OCFS then moved L.B. to the OCFS limited secure Taberg Residential Center in Taberg, New York, where he remained for several days.

145. From Taberg, OCFS transferred L.B. to the OCFS limited secure Highland Residential Center, located in Highland, New York, where he currently resides.

146. Prior to entering OCFS custody, L.B. had received community-based counseling services for one year because of problematic school behavior when he was nine or ten years old.

147. In or about January 2009, L.B. was evaluated by the Family Court Mental Health Services ("MHS"), and was diagnosed with conduct disorder, and provisionally diagnosed with a learning disorder and borderline intellectual functioning.

148. The MHS recommended that L.B. receive a psychiatric evaluation and counseling with a

31

focus on judgment, impulse control, decision-making and anger management.

149. In September 2009, the Family Court Mental Health Services again evaluated L.B. and diagnosed him with a conduct disorder, as well as a provisional diagnosis of attention deficit/hyperactivity disorder. MHS suggested that psychiatric medications be explored.

150. When L.B. was at OCFS' Pyramid Reception Center, a staff member, John Doe #6, grabbed him by his shirt collar and threw him off the couch, causing L.B. to land on the floor. L.B. does not know why the staff member threw him on the floor.

151. When L.B. was moved to Highland, L.B. threatened to commit suicide. OCFS staff placed L.B. on Arms Length Supervision, in which a staff member stays next to the child at all times, after he threatened to commit suicide, but provided no other evaluation or treatment. OCFS staff never brought L.B. to see a mental health professional after he spoke of suicide.

152. In or about December 2009, while he was in the day area, a male OCFS staff member threatened L.B. by saying he was going to "shove [his] foot in [L.B.'s] ass." The same staff member also walked in the room while L.B. was trying to get dressed and refused to leave. When L.B. asked the staff person to leave, the staff member refused, and L.B. was forced to get dressed under the covers of his bed.

153. While in OCFS custody, L.B. has witnessed three or four other residents being physically restrained by staff. On one occasion at Taberg, L.B. saw a resident knock something over. In response, OCFS staff members dragged the boy to the ground. L.B. heard the resident hit the concrete from several feet away. The resident, who suffers from asthma, was screaming that he could not breathe, yet L.B. watched staff hold the boy down for approximately fifteen minutes before handcuffing him and taking him to his room.

32

J.A.

154.    Plaintiff J.A. is 16-year-old boy who was placed in OCFS custody by a New York State

Family Court judge in December 2009.  He currently resides at the OCFS Pyramid

Reception Center, located in the Bronx, New York.

155.    J.A.'s home is in New York, New York, with his mother, M.F..

156.    J.A. has a history of psychiatric treatment and hospitalization.  He was diagnosed with

Attention Deficit Hyperactivity Disorder ("ADHD") in or about 2005.

157.    In April 2009, the psychiatrist who had been treating J.A. for 10-11 years reported that he

is learning disabled and that he suffered from hyperactivity and Attention Deficit

Disorder.  The psychiatrist recommended residential treatment.

158.    J.A. has been prescribed Concerta, Methylin, Clordine, and Risperdal.

159.    Before being placed with OCFS, J.A. attended school in a special education setting.

160.    In December 2009, a New York State Family Court judge placed J.A. with OCFS after a

juvenile delinquency finding.

161.    The Family Court Mental Health Services evaluation in the delinquency case

recommended that J.A. be placed in a therapeutically-oriented residential setting.  Family

Court Mental Health Services also concluded that J.A. is in the low average range of

cognitive functioning, and diagnosed him with a conduct disorder and ADHD.

162.    J.A. has been at Pyramid Reception Center since December 17, 2009.

163.    Since J.A. has been at Pyramid, he has not had his medication reviewed by a psychiatrist

nor has he been seen by any mental health professional.

164.    When J.A. arrived at Pyramid, he spoke with his unit counselor for about five minutes.

The counselor did not ask J.A. about his medications, and did not ask whether he wanted

to speak to mental health staff.

165. When he was placed in December 2009, the judge ordered that J.A. should be provided with anger management treatment and domestic violence counseling. J.A. has not been given either since he has been at Pyramid.

166. No OCFS staff has asked J.A. if he wants to see a counselor since he arrived at Pyramid.

167. Despite the recommendation for a therapy-oriented residential setting, J.A. has received no therapy at all since his OCFS placement except for a group counseling session about sexuality education..

168. J.A. would like to engage in therapy.

S.S.

169. Plaintiff S.S. is a 16-year-old boy who was placed in OCFS custody by a New York State Family Court judge in or around May 2009. He currently resides at the OCFS limited secure Highland Residential Center, located in Highland, New York.

170. S.S.'s home is in Queens, New York, with his mother, V.S., and his brother, grandfather, uncle, sister and stepfather.

171. In or about November 2008, S.S., following a psychiatric consultation, was placed on medication to manage feelings of depression.

172. On or about January 27, 2009, a Family Court evaluation found that S.S has significant cognitive limitations. The evaluation recommended therapy and psychopharmacological evaluations.

173. In May 2009, a New York State Family Court judge placed S.S. with OCFS after a juvenile delinquency finding.

174. S.S. spent two weeks at OCFS' Pyramid Reception Center where a needs assessment was

performed. The diagnoses included anxiety disorder, disruptive behavior disorder, phonological, reading and mathematics disorders, disorder of written expression and learning disorders. Additionally, S.S. was found to have a history of acute trauma disorder. He was also given a provisional diagnosis of mild mental retardation.

175. OCFS moved S.S. to Highland Residential on or about June 15, 2009.

176. S.S. has not seen a psychiatrist or other doctor since he has been at Highland.

177. S.S. receives counseling from an OCFS staff member and attends group counseling led by an OCFS male staff member or other residents. Upon information and belief, these staff are not mental health professionals.

178. S.S. would like to see a therapist.

179. On or about August 12, 2009, S.S. was diagnosed by the Highland Committee on Special Education as having mental retardation.

180. On or about September 15, 2009, Highland OCFS staff's "treatment team plan notes" indicate with regard to S.S. that staff have been "unable to explore his legal problems due to comprehension," and in the same notes state that S.S. "[l]ikes to play dumb so he does not have to work and others do not expect more from him."

181. In or about October 2009, OCFS "treatment team plan notes" indicate limited or no progress in reaching normal behavioral levels of performance for his age. The notes go on to state "youth's cognitive limitations do impact his ability to follow program…"

182. During the time that S.S. has been at Highland, he has been physically restrained several times by OCFS staff.

183. On or about July 28, 2009, S. S. was told to go into his room. He argued with a male staff member and two staff members, John Doe #7 and John Doe #8, restrained S.S..

184. On or about August 10, 2009, a staff member, John Doe #9, restrained S.S. after S.S. refused to go back to his unit.

185. On or about August 28, 2009, OCFS staff member John Doe #10 restrained S.S. because he would not stop talking while in line.

186. In or about the late summer or fall of 2009, S.S. was restrained again. He knocked on the door to his room to alert OCFS staff that he needed to use the bathroom. S.S. has a known bladder problem. A male staff member told S.S. to wait before he was allowed to go to the bathroom.

187. After S.S. knocked on the door again, a male staff member, John Doe #11, came to S.S.'s door, opened it, and told S.S. to apologize before he would let S.S. go to the bathroom. S.S. tried to get past the male staff member because he needed to go to the bathroom, which S.S. told him. The male staff member started poking the left side of S.S.'s face, asking, "Why are you playing with me?" S.S. pushed the staff member's hand away and the staff member threw S.S. on his bed.

188. A second male staff member, John Doe #12, ran into the room, grabbed S.S. from the bed, pushed him onto the floor and called for other staff. Two additional male staff, John Doe #13 and John Doe #14, arrived and handcuffed S.S. with his hands behind his back. At no point did S.S. resist.

189. After the staff members handcuffed S.S, they grabbed his hands and pulled them up and away from his back. S.S. screamed because it was painful. The staff members then picked S.S. off the ground and brought him outside and across the grounds to the Central Service Unit. S.S. was barefoot.

190. At the Central Service Unit, the Administrator on Duty ("AOD") told S.S. that the male

staff member said S.S had punched him, but the AOD said he didn't believe that happened. The AOD told S.S. he didn't think S.S. hit anyone because S.S. had no history of doing anything like that. The AOD lowered the write-up of the incident from a Level 3 to a less-serious Level 1 disciplinary write-up.

191. S.S. was restrained another time for arguing with a peer and was pushed to the ground by a staff member, John Doe #15. After that restraint, OCFS staff wrote up S.S. with a disciplinary violation so that he would be punished.

A.D.

192. Plaintiff A.D. is a 15-year-old boy who was placed in OCFS custody by a New York State Family Court judge in or about November 2007.

193. He currently resides at the OCFS limited secure Finger Lakes Residential Center, located in Lansing, New York.

194. A.D.'s home is in Brooklyn, New York, with his mother, J.D..

195. Since A.D. has been at Finger Lakes, he has been restrained at least twice by OCFS staff members.

196. The first time A.D. was restrained was approximately two weeks after he arrived at Finger Lakes Residential Center.

197. On or about October 1, 2009, a male staff member, John Doe #16, told A.D. that he was going to be on ALS -- Arms Length Supervision. A.D. did not want to be on ALS and told the male staff member that. A.D. did not offer any resistance or threaten staff in any way, but the male staff member signaled for other staff and restrained A.D..

198. There were three OCFS staff members, John Doe #16, John Doe #17, and John Doe #18, on top of A.D., who was held face down on the ground. One staff member was on A.D.'s

37

legs, another staff member was on A.D.'s back and the third staff member restrained A.D.'s arms.

199. Before restraining A.D., knowing that the result would be a facial injury, the staff members put a t-shirt on the ground so that A.D.'s face would be on the t-shirt.

200. A.D. experienced severe pain during this restraint. His arms hurt because while he was on the ground, the staff bent his arms back, almost touching his head.

201. After restraining A.D. for several minutes on the ground, the staff members handcuffed A.D. with his arms behind his back for a few minutes. The staff members then let A.D. get up and they took him to the medical unit.

202. Following this restraint, the OCFS Finger Lakes medical unit reported that A.D. had red marks from handcuffs and that A.D.'s shoulder was sore.

203. On or about October 13, 2009, A.D. was in his room reading a book. A male staff member, John Doe #19, entered A.D.'s room and passed gas. A.D. asked the staff member what his problem was and the staff member punched A.D. in the nose resulting in bleeding. The male staff member then signaled for other staff and banged A.D.'s head against the wall. The staff member along with three or four other staff members, John Does #20-23, then restrained A.D. on the floor on his stomach and rubbed A.D.'s head on the floor. A.D. had a rug burn on his face as a result of the restraint and experienced serious pain. A.D. felt dazed and dizzy following the restraint.

204. Following this restraint, the OCFS Finger Lakes medical unit reported that A.D. was restrained and handcuffed and that he suffered an abrasion to his chin.

205. A.D. has witnessed many other boys restrained by OCFS staff at Finger Lakes. A.D. has seen staff members hit other residents' heads against a desk and give them rug burns.

38

206.    A.D. has seen residents restrained for not walking when told to walk. A.D. has also seen
        other residents restrained after horsing around.

S.R.

207.    Plaintiff S.R. is a 16-year-old girl who was placed in OCFS custody by a New York State
        Family Court judge in August 2009. She currently resides at the OCFS limited secure
        Tryon Girls Residential Center, located in Johnstown, New York.

208.    S.R.'s home is in the Bronx, New York, with her mother, E.R..

209.    Prior to being in OCFS custody, S.R. received in-home counseling services, beginning in
        March 2009.

210.    In May 2009, S.R. was psychiatrically hospitalized at Elmhurst Hospital Center for two
        days, after which a Family Court judge remanded her to the custody of the New York
        City Department of Juvenile Justice ("DJJ").

211.    S.R. remained in the custody of DJJ through August 2009. Various DJJ staff persons
        made mental health referrals for S.R., and DJJ determined that S.R. often required one-to-
        one supervision for her own safety and crisis intervention.

212.    In August 2009, a DJJ staff person found S.R. with a t-shirt wrapped around her neck.

213.    In August 2009, a New York State Family Court judge placed S.R. with OCFS after a
        juvenile delinquency finding.

214.    S.R. spent two weeks at OCFS' Tryon Girls Reception Center. While at Tryon Reception,
        an OCFS psychologist diagnosed S.R. with conduct disorder and adjustment disorder
        with depressed mood, and documented that S.R. had a history of suicidal ideation and
        attempts, and a psychiatric hospitalization.

215.    OCFS transferred S.R. to their Staten Island Community Residential Center, and then on

December 2, 2009 to Tryon Girls Residential Center.

216. At Tryon, OCFS conducted a mental health assessment, making a diagnostic impression of conduct disorder and documenting that while S.R. was in the custody of DJJ she was "depressed, frequently express[ed] suicidal statements, and would on occasion cry and scream continuously."

217. This OCFS assessment recommended that S.R. receive individual and group therapy.

218. While at Tryon, S.R. has been housed on a regular unit without any special services.

219. At Tryon, S.R. has met with a clinician one time.

220. On two occasions S.R. has asked to speak with the clinician again, but OCFS staff told her that the doctor was busy and would get back to S.R. As of a week later, S.R. had not met with the clinician, nor has she had an opportunity to speak with any mental health professionals.

221. S.R. would like to meet with a mental health professional regularly.

222. S.R. has never received family counseling in an OCFS facility. She seeks to receive family counseling, to assist with her return home after OCFS placement.

223. While at Tryon, S.R. was been physically restrained once, and has seen other girls restrained almost daily.

224. On December 10, 2009, S.R. was physically restrained by OCFS staff in the recreational area of her unit.

225. S.R. and other residents were playing cards when one resident began to hit S.R.

226. Two OCFS staff people ran over and, without warning, one staff person, John Doe #24, grabbed S.R. from behind, moved her several feet away from the other residents, and then threw her on the floor so that S.R.'s face hit the ground.

227. While staff were holding S.R. face down on the ground, a male staff person, John Doe #25, pushed down with his knee on her back and held her arms behind her back. The staff person then locked S.R. in her room. S.R. suffered a cut lip and a long scratch on her back.

S.M.

228. Plaintiff S.M. is a 15-year-old girl who was placed in OCFS custody by a New York State Family Court judge in or about February 2009.

229. She currently resides at the OCFS limited secure Tryon Girls Residential Center, located in Johnstown, New York.

230. S.M.'s home is in New York County, New York, with her mother, E.B., and siblings.

231. During the course of a juvenile delinquency case, the Family Court Mental Health Services found that S.M.'s evaluation scores suggested a reading disability.

232. Family Court Mental Health Services also diagnosed S.M. with conduct disorder and recommended individual and group therapy as well as family therapy.

233. When the Family Court placed S.M. in OCFS custody, the judge specifically ordered OCFS to follow the recommendations of the Family Court Mental Health Services.

234. Upon entering OCFS custody, OCFS sent S.M. to the Tryon Girls Reception Center in Johnstown, New York, where she was housed for approximately two weeks.

235. OCFS then transferred S.M. to Brentwood Residential Center and, in April 2009, to Tryon Girls Residential Center.

236. While at Tryon Girls, S.M. received a psychiatric evaluation and was diagnosed with adjustment disorder, conduct disorder, and attention deficit hyperactivity disorder.

237. OCFS staff have physically restrained S.M. approximately 15-20 times since she entered

OCFS custody.

238. On her first day at Tryon Girls alone, OCFS staff restrained S.M. two or three times.

239. The first restraint on April 7, 2009, took place while S.M. was in the Central Services Unit. When S.M. did not move as OCFS staff had instructed, two OCFS staff, John Doe #26 and John Doe #27, responded by hooking S.M.'s arms from behind and pushing her to the floor on her side. OCFS staff held her down for several minutes.

240. The second restraint on April 7, 2009 took place when OCFS staff members tried to escort S.M. to the medical unit. One staff member, John Doe #28, hooked S.M.'s arms from behind, and S.M. threw herself to the floor. Two staff members, John Doe #28 and John Doe #29, then restrained her, one on her arms and one on her legs. They restrained her on the floor for approximately 10 minutes.

241. Upon information and belief, during the second restraint of S.M. on April 7, 2009, S.M. was handcuffed for approximately 10 minutes.

242. S.M. had difficulty breathing during this restraint, and when she told the two staff members who were restraining her, they did nothing to adjust their holds so that she could breathe more easily. As a result of this restraint, S.M. suffered pain and a rug burn to her left cheek that took several weeks to heal.

243. On April 29, 2009, two OCFS staff, John Does #30 and #31, restrained S.M. after S.M. did not follow program rules and moved toward a staff member who was attempting to physically move S.M. out of her room.

244. S.M. suffered an injured shoulder during this restraint.

245. On May 6, 2009, S.M. was in line with other residents moving back to her Unit when two OCFS staff, John Does #32 and #33, physically restrained her after she yelled at staff

members and refused to follow staff directives.

246.  In or about May 2009, S.M. was in the cafeteria with her unit. The unit went outside, and

S.M. took off her outer uniform shirt, leaving on the shirt she wore underneath it.

Without warning, OCFS staff, John Doe #34, hooked S.M.'s arms behind her back and

dropped S.M. to the ground. OCFS staff held her arms and legs down and restrained her

that way for several minutes.

247.  On May 6, 2009, S.M. was restrained by two OCFS staff members, John Does #35 and

#36, while on her unit.

248.  S.M. has witnessed other residents at Tryon Girls being restrained.

249.  On May 23, 2009, S.M. was upset that OCFS staff were physically restraining her friend,

and she banged on her room door. Two female staff members physically removed S.M.

from her room by grabbing her arms and escorting her to a different room.

250.  On the morning of June 4, 2009, while S.M. was in the dining room, she had words with

a male OCFS staff member, John Doe #37. OCFS staff pushed her to the floor and

placed her in a prone physical restraint, slamming her face on the floor and pulling her

arms behind her back.

251.  S.M. suffered pain on her face and in her arms as a result of that restraint.

252.  On June 30, 2009, S.M. pushed past a staff member who was standing in the doorway of

S.M.'s room after S.M. was told to stay in her room. Two OCFS staff, John Does #38

and #39, then pushed S.M. to the floor and placed her in a prone restraint for

approximately five minutes.

253.  On the morning of July 30, 2009, a Tryon Girls Incident Report states: "S.M. wanted to

go to time out. There was not enough staff available." S.M. and another resident began

43

arguing. An OCFS staff member, John Doe #40, then hooked S.M.'s arms behind her back and threw her to the floor in a prone restraint. S.M. struggled and hit her face on the corner of the wall.

254.   S.M. suffered injuries to the right side of her face, including swelling to the outer portion of her eye.

255.   On October 23, 2009, two OCFS staff, John Does #41 and #42, put S.M. in a prone physical restraint, and held her on the floor for several minutes.

256.   Later on October 23, 2009, S.M. refused to leave the bathroom and at least two OCFS staff, John Does #43 and #44, pushed her to the floor and placed her in another prone restraint in the bathroom at Tryon Girls.

A.S.

257.   Plaintiff A.S. is a 15-year-old boy who was placed in OCFS custody by a New York State Family Court judge in August 2009. He currently resides at the OCFS limited secure Highland Residential Center, located in Highland, New York.

258.   A.S.'s home is in the Bronx, New York, with his mother, C.S., and his brothers and sisters.

259.   Before being placed in OCFS custody, A.S. took the medications Concerta and Risperdal for attention deficit hyperactivity disorder and was in therapy biweekly.

260.   OCFS initially placed A.S. at their Pyramid Reception Center in the Bronx, New York.

261.   While there, A.S. received no therapy or mental health treatment.

262.   After Pyramid, OCFS sent A.S. to the Highland Residential Center, in or around August 2009.

263.   At Highland, A.S. is housed on a unit without any special mental health services.

264. While in OCFS custody at Highland, OCFS staff initially told A.S. that he did not need the medication, even though A.S. asked to be put back on the medication after receiving several write-ups because of his behavior.

265. It took approximately six weeks before the psychiatrist who reviews medications for OCFS saw A.S..

266. A.S. is now taking Concerta and Risperdal again, twice each day.

267. OCFS placed A.S. on Arms Length Supervision for approximately two weeks at Highland. During Arms Length Supervision, a staff person stays next to the resident at all times.

268. A.S. was physically restrained by OCFS staff in or about November 2009. A.S. was in class, and an OCFS staff person, John Doe #45, grabbed him and signaled for backup.

269. The staff person pushed A.S. onto the floor and held A.S. on his stomach. Approximately eight staff came in response to the alarm signal.

270. After this restraint, another OCFS staff person escorted A.S. downstairs and told A.S. to "shut up" while A.S. was trying to tell him what happened.

271. A.S. was restrained again in front of the Central Services Unit by OCFS staff, John Doe #46. During this restraint, staff twisted A.S.'s arm behind his back for several minutes, causing significant pain. A.S.'s arm continued to hurt after the restraint.

272. A.S. did not know why he was being restrained in either instance.

273. A.S. has seen other boys be restrained by staff. In December 2009, A.S. witnessed approximately four OCFS staff take down a boy and twist his arm and leg.

274. In October or November 2009, A.S. was in the cafeteria and witnessed two OCFS staff restrain a boy who was about to hit another boy by putting him on the floor, handcuffing

him, and getting on top of him and putting a knee on his back.

275. A.S. has seen OCFS staff twist the legs or arms of other boys at Highland.

276. After A.S. was restrained, OCFS staff also punished him with a Level 3, 60-day hold. This is a type of punishment for violating rules, that results in restrictions on children in OCFS custody.

C.L.

277. Plaintiff C.L. is a 13-year-old boy who was placed in OCFS custody by a New York State Family Court judge in November 2008. He currently resides at the OCFS limited secure Highland Residential Center, located in Highland, New York.

278. C.L.'s home is in the Bronx, New York, with his mother, K.M., and siblings.

279. C.L. was hospitalized multiple times between the ages of nine and eleven due to suicidal ideations. His most recent psychiatric hospitalization was in 2007.

280. C.L. was diagnosed with bi-polar disorder at age nine and depression at age eleven.

281. C.L. was prescribed Abilify and Depakote and referred for counseling three times a week in his community.

282. C.L.'s mother voluntarily placed him in foster care, where he was evaluated at a diagnostic reception center and subsequently placed in a therapeutic foster boarding home before returning home.

283. C.L.'s father filed a Persons in Need of Supervision ("PINS") petition which resulted in another voluntary foster care placement at another diagnostic reception center and then in a residential treatment center.

284. The residential treatment center diagnosed C. L. with conduct disorder and mood disorder. While at the residential treatment center, C.L. engaged in therapy with a social

worker.

285.  In November 2008, a New York State Family Court judge placed C.L. with OCFS after a
      juvenile delinquency finding.

286.  The Family Court Mental Health Services evaluation in the delinquency case
      recommended that C.L. be placed in a facility that has psychiatric monitoring and family
      therapy.

287.  C.L. was housed for two weeks at OCFS' Pyramid Reception Center in or about
      November 2008. OCFS staff at Pyramid diagnosed him with conduct disorder and a
      mood disorder, and recommended individual therapy.

288.  C. L. was then moved to Highland Residential in or about December 2008.

289.  While at Highland, C. L has been housed on a regular unit without any mental health
      services despite his history and the recommendation of the reception center evaluator.

290.  In July 2009, despite his history and mental health diagnoses, a Highland treatment team
      meeting form noted that C.L. did not need any mental health services.

291.  While at Highland, C.L. has been physically restrained once, as described below, and has
      seen others restrained almost daily.

292.  At Highland, C.L. was physically restrained by OCFS staff in or about June 2009.

293.  C.L. was on medical restriction because of his injured finger, but he wanted to play
      basketball.  A male staff member told C.L. he could not play because he was on medical
      restriction.  C.L. wanted to play and threw the basketball up toward the hoop.

294.  C.L. then told the staff member that he would walk to the Central Service Unit, because
      C.L. knew he was going to get in trouble.  The staff member, John Doe #47, then came
      up behind C.L., grabbed him and forced him to the ground in a prone restraint.

47

295. The staff member banged C.L.'s head on the ground two or three times while he was restraining C.L.

296. The staff member then called Central Service Unit to have another staff member come and get C.L.

297. While being restrained, C.L. was terrified, and his injured head hurt for the rest of the day.

298. C.L. was never taken to see a doctor or nurse after the restraint. He was not given any medication for the headache he had after the restraint.

299. C.L. has also seen other boys be restrained by OCFS staff at Highland.

300. C.L. saw one boy restrained because the boy did not want to leave his dorm room. C.L. saw staff twist the boy's arm and hold him down, and saw that the boy's face was bloody.

301. Another boy whom C.L. saw restrained by OCFS staff had his arm badly twisted.

302. Based on the foregoing factual allegations, Plaintiffs assert the following claims for relief:

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: Against Defendant Carrión
### Violation of the Fourteenth Amendment to the United States Constitution

303. Plaintiffs and class members are each children under the age of eighteen in the custody and care of OCFS, which is the government agency designated under the laws of the State of New York as responsible for the health and welfare of Plaintiffs and class members.

304. The Fourteenth Amendment to the United States Constitution, which prohibits the

deprivation of "life, liberty, or property without due process of law," guarantees to each child in state custody the substantive right to be free from harm and from undue restraints on their liberty. *Youngberg v. Romeo*, 457 U.S. 307 (1982).

305. Defendant Carrión has deprived Plaintiffs and class members of their liberty without due process of law by failing to provide youth in OCFS facilities who have mental illness with adequate mental health treatment and therapeutic housing options necessary to treat and to prevent worsening of their mental illness. As set forth above, the Defendant Commissioner and her agents have failed to provide treatment for serious mental illnesses actually known to them, have failed to carry out their own agency's instructions regarding mental health treatment for known serious mental illnesses, have failed adequately to assess the medication needs of class members known to have been prescribed mental health medications before admission to the facilities at issue in this Complaint, and have failed to provide adequate assessment, diagnosis, and treatment plans for class members whose prior history of psychiatric diagnosis, treatment, and hospitalization have placed Defendant and her agents on actual knowledge of a substantial risk of untreated serious mental illness. This persistent pattern of inadequate mental health care affecting all of the named plaintiffs in multiple institutions constitutes a policy and practice of deliberate indifference that is shocking to the conscience.

306. Plaintiffs and class members have been harmed by Defendant's violations of their rights under the Fourteenth Amendment. Plaintiffs and class members' harms include, but are not limited to, psychological and emotional damage and in some cases physical injury during the course of their confinement. They will continue to suffer such harm in the future as a result of the lasting impact of Defendants' conduct.

307.   Plaintiffs and class members accordingly seek redress pursuant to 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION: Against all Defendants
### Violation of the Fourteenth Amendment to the United States Constitution

308.   Plaintiffs and class members are each children under the age of eighteen in the custody
       and care of OCFS, which is the government agency designated under the laws of the
       State of New York as responsible for the health and welfare of Plaintiffs and class
       members.

309.   The John Doe Defendants, as OCFS employees, at all times relevant hereto, were acting
       under color of state law.

310.   The Fourteenth Amendment to the United States Constitution, which prohibits the
       deprivation of "life, liberty, or property without due process of law," guarantees to each
       child in state custody the substantive right to be free from harm and from undue restraints
       on their liberty. *Youngberg v. Romeo*, 457 U.S. 307 (1982).

311.   Defendants have deprived Plaintiffs and Class members of their liberty without due
       process of law by subjecting them to gratuitous and excessive force and punishment.
       Defendants' conduct manifests deliberate indifference to plaintiffs' constitutional rights
       and is shocking to the conscience.

312.   Defendants have deprived Plaintiffs and other class members of their liberty without due
       process of law by using physical force against class members who are not physically
       resisting staff and pose no threat to themselves or others, as set forth above.  Rather,
       physical force is applied as a punishment against class members for no more than verbal
       misconduct or refusal immediately to follow orders, and in some cases for no reason at all
       that is apparent to the class member.  This conduct results in both physical and mental or

emotional injury to class members.

313. Defendants have used physical force against children with mental illness who cannot control their behavior or understand what is expected of them. The use of force against persons with mental illness can aggravate their illness.

314. Plaintiffs and class members have been harmed by Defendant's violations of their rights under the Fourteenth Amendment. Plaintiffs and class members' harms include, but are not limited to, psychological and emotional damage and physical injury during the course of their confinement. They will continue to suffer such harm in the future as a result of the lasting impact of Defendants' conduct.

315. Plaintiffs and class members accordingly seek redress pursuant to 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION

**Against Defendant Carrión, on Behalf of Plaintiffs G.B., L.B., J.A., S.S., S.R., C.L., and Class Members With Disabilities**
**Violation of Title II of the Americans with Disabilities Act**

316. Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, bars public entities from discriminating against any qualified individual with a disability on the basis of disability and from excluding any qualified individual with a disability from "participation in or the benefits of the services, programs or activities of the public entity" on the basis of disability. 42 U.S.C. §§ 12131-12132.

317. A public entity is required to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Thus, it is a violation of Title II of the ADA for a public entity to fail to administer services, programs, or activities to qualified individuals with disabilities in the most integrated setting appropriate to their needs.

51

318. Public entities may not exclude a qualified individual with a disability from participation in or the benefits of their services, programs or activities, whether "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1); see also 28 C.F.R. § 35.130(b)(3).

319. OCFS is a "public entity" within the meaning of the ADA.

320. Plaintiffs G.B., L.B., J.A., S.S., S.R., C.L., and many members of the Class are qualified individuals with disabilities as defined in the ADA. They have mental impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, and interacting with others; they have records of having such an impairment; or they are regarded as having such an impairment. As youth in the custody of OCFS' Division of Juvenile Justice and Opportunities for Youth, all plaintiffs meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant OCFS. 42 U.S.C. §12102(2); 42 U.S.C. § 12131 (2).

321. Plaintiffs G.B., L.B., J.A., S.S., S.R., C.L., and class members with disabilities are each a "qualified individual with a disability" within the meaning of the ADA. Under the ADA, an "individual with a disability" includes an individual who is "regarded as having...an impairment." 42 U.S.C. § 12102(1)(C). Plaintiffs who have mental health disabilities or have been identified by OCFS as having mental health needs are undisputedly "regarded as having...an impairment" by OCFS.

322. Defendant Carrión discriminates against mentally disabled youth in OCFS facilities by knowingly and through deliberate indifference failing to provide necessary mental health services as a means of preventing or reducing the exposure to and the use by staff of

improper and harmful physical restraints.

323. Defendant Carrión discriminates against mentally disabled youth in OCFS facilities by knowingly and through deliberate indifference failing to provide disciplinary alternatives to physical restraint as a reasonable accommodation so that the restraints, which exacerbate mental illness, are not imposed.

324. Defendant Carrión discriminates against mentally disabled youth in OCFS facilities by failing to provide an effective means for Plaintiffs to report incidents of use of excessive force or unreasonable restraint, without fear of retaliation.

325. Defendant Carrión discriminates against mentally disabled youth in OCFS facilities on the basis of their disabilities in violation of the ADA.  42 U.S.C. §12132.

## FOURTH CAUSE OF ACTION

**Against Defendant Carrión, on Behalf of Plaintiffs G.B., L.B., J.A., S.S., S.R., C.L., and Class Members with Disabilities**
**Violation of Section 504 of the Rehabilitation Act**

326. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) states:

327. "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity . . . ."

328. The Rehabilitation Act states that "recipients [of federal financial assistance] shall administer programs or activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 CFR § 41.51(d).

329. Furthermore, recipients of federal funds may not exclude a qualified individual with a disability from participation in or the benefits of any aid, benefit, or service, whether

"directly or through contractual, licensing, or other arrangements." 28 C.F.R.

§ 41.51(b)(1); *see also* 28 C.F.R. § 41.51(b)(3).

330.    Plaintiffs G.B., L.B., J.A., S.S., S.R., C.L., and many of the class members are qualified

individuals with disabilities as defined in Section 504. They have mental  impairments

that substantially limit one or more major life activity, including but not limited to

thinking, concentrating, and interacting with others; they have records of having such an

impairment; or they are regarded as having such an impairment. As youth in the custody

of OCFS' Division of Juvenile Justice and Opportunities for Youth, all plaintiffs meet the

essential eligibility requirements for the receipt of services or the participation in

programs or activities provided by Defendant OCFS. 29 U.S.C. § 794.

331.    Plaintiffs G.B., L.B., J.A., S.S., S.R., C.L., and many of the class members are qualified

individuals "with a disability" within the meaning of the Rehabilitation Act. Under the

Rehabilitation Act, an "individual with a disability" includes an individual who is

"regarded as having…an impairment." 29 U.S.C. § 705(20)(B). Plaintiffs are

undisputedly "regarded as having…an impairment" by OCFS

332.    Defendant Carrión's OCFS is a public entity.  OCFS receives federal financial assistance.

333.    Defendant Carrión discriminates against mentally disabled youth in OCFS facilities by

knowingly and through deliberate indifference failing to provide necessary mental health

services as a means of preventing or reducing the exposure to and the use by staff of

improper and harmful physical restraints.

334.    Defendant Carrión discriminates against mentally disabled youth in OCFS facilities by

knowingly and through deliberate indifference failing to provide disciplinary alternatives

to physical restraint as a reasonable accommodation so that the restraints, which

54

exacerbate mental illness, are not imposed.

335.    Defendant Carrión discriminates against mentally disabled youth in OCFS facilities by
failing to provide an effective means for Plaintiffs to report incidents of use of excessive
force or unreasonable restraint, without fear of retaliation.

**336.**    Defendant Carrión discriminates against mentally disabled youth in OCFS facilities on
the basis of their disabilities in violation of Section 504.

### Prayer for Relief

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

a.    Certify this case as a class action pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal
Rules of Civil Procedure;

b.    Issue a declaratory judgment declaring that the acts, omissions, policies, and practices of
Defendant Carrión with regard to youth in her custody in OCFS' limited secure centers,
reception centers, and the nonsecure Lansing facility violate the Fourteenth Amendment
to the United States Constitution; the Rehabilitation Act, 29 U.S.C. §794; and the
Americans with Disabilities Act of 1990, 42 U.S.C. §12132;

c.    Enjoin Defendant Carrión, her agents, officials, employees, and all persons acting in
concert with them, under color of State law or otherwise, from continuing the
unconstitutional and illegal acts, conditions, and practices described in this Complaint;

d.    Order Defendant Carrión, her agents, officials, employees, and all persons acting in
concert with them, under color of State law or otherwise, to take all necessary actions to:

i.    provide policies, practices and training that ensure that Plaintiffs will not be
subjected to unreasonable physical restraints and use of excessive force by
OCFS staff;

ii.    establish an effective monitoring system to ensure supervision and accountability
of staff with respect to the use of excessive force and physical restraints and to ensure the safety
of Plaintiffs who report staff abuse; including an effective means for Plaintiffs to complain of
incidents of use of excessive force or unreasonable restraint, without fear of retaliation.

iii.    provide adequate mental health assessment and treatment programs and services,
including increased and qualified mental health professional staffing to provide adequate mental
health screening, monitoring and treatment to children with mental health needs within the OCFS

facilities at issue in this case;

      iv.     train all OCFS staff during pre-service and in-service training programs to recognize the signs and symptoms of mental illness and steps to take to ensure the safety and treatment of residents; and

      v.     establish an effective monitoring system to ensure supervision and accountability of staff with respect to the provision of mental health services, and to ensure the safety of Plaintiffs who complain, including an effective means for Plaintiffs to complain of OCFS' failure to provide adequate mental health services, without fear of retaliation;

e. Order Defendant Carrión to develop and implement a comprehensive plan for the correction of the unlawful policies, practices, acts, and omissions complained of herein and to submit this plan to the Court and to the attorneys for the Plaintiffs for review and comment before the Court orders the plan;

f.     Award Plaintiff G.B. compensatory and punitive damages in an amount to be determined at trial against Defendants John Does #1-5 for violation of his federal constitutional rights;

g.     Award Plaintiff L.B. compensatory and punitive damages in an amount to be determined at trial against Defendant John Doe #6 for violation of his federal constitutional rights;

h.     Award Plaintiff S.S. compensatory and punitive damages in an amount to be determined at trial against Defendants John Does #7-15 for violation of his federal constitutional rights;

i.     Award Plaintiff A.D. compensatory and punitive damages in an amount to be determined at trial against Defendants John Does #16-23 for violation of his federal constitutional rights;

j.     Award Plaintiff S.R. compensatory and punitive damages in an amount to be determined at trial against Defendants John Does #24-25 for violation of her federal constitutional rights;

k.     Award Plaintiff S.M. compensatory and punitive damages in an amount to be determined at trial against Defendants John Does #26-44 for violation of her federal constitutional rights;

l.     Award Plaintiff A.S. compensatory and punitive damages in an amount to be determined at trial against Defendants John Does #45-46 for violation of his federal constitutional rights;

m.     Award Plaintiff C.L. compensatory and punitive damages in an amount to be determined at trial against Defendant John Doe #47 for violation of his federal constitutional rights;

n.     Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts, and omissions complained of herein at all of the facilities complained of in this action no longer exist and this Court is satisfied that they will not recur;

o.     Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

p.    Grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
       December 30, 2009

Yours,

THE LEGAL AID SOCIETY
STEVEN BANKS, Attorney in Chief
NANCY ROSENBLOOOM,
Director, Juvenile Rights Practice Special
Litigation &  Law Reform Unit
CHRISTINE BELLA, of counsel
199 Water Street
New York, New York  10038
(212) 577-3265

By: _____
     Christine Bella (CB 5605)

ORRICK, HERRINGTON & SUTCLIFFE,
L.L.P.
J. PETER COLL, Jr.
RENE KATHAWALA
666 Fifth Avenue
New York, NY  10103
(212) 506-5000

By: _____
     J. Peter Coll, Jr.

*Attorneys for Plaintiffs and Proposed Class*

This document will be filed electronically.

57